IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

COKIE JOE GOPSHES, JR.,      *

     Plaintiff,          *

v.                       *          Civil Action No. GLR-17-3303

DR. CLEM, et al.,[1]       *

     Defendants.      *
                              *****

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendants Jason Clem, M.D. and Ben Oteyza, M.D.'s Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 11). This 42 U.S.C. § 1983 (2018) action arises from Plaintiff Cokie Joe Gopshes, Jr.'s allegations that Defendants were deliberately indifferent to his back pain in violation of the Eighth Amendment to the U.S. Constitution. The Motion is ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant the Motion.

---

[1] The Court will direct the Clerk to amend the docket to reflect Defendants' full names.

# I.     BACKGROUND

## A.     <u>Factual Background</u>[2]

### 1.     **Gopshes' Complaint & Opposition**[3]

Gopshes was in a serious tractor-trailer accident on August 1, 2013 and was taken to the Shock Trauma Department at the University of Maryland Medical Center ("UMMC"). (Compl. at 2, 5, ECF No. 1).[4] Gopshes' Complaint is unclear about the precise injuries he received in the accident. He states that the treating doctors at UMMC informed him that he "would need to have surgery to cut crooked tailbone," because it "would grow back not straight," and cause him "horrific unbearable pain" due to a "burst fracture." (Id. at 2, 5). Gopshes' Opposition adds some detail about his accident and injuries. It states that "the impact of [the tractor-trailer into trees at sixty-five miles per hour] burst[ ] fractured" Gopshes' "L-1, tailbone, nose bone, and knocked out [his two] front teeth." (Pl.'s Opp'n at 1, ECF No. 13). It further states that "Shock [T]rauma said [there] was prob[ab]ly some hip damage" and that Gopshes "needed an MRI to see if that was the case." (Id.).

At some unspecified point after the accident, Gopshes was incarcerated at Eastern Correctional Institution ("ECI") in Westover, Maryland. (See Compl. at 1). Gopshes'

---

[2] Unless otherwise noted, the facts outlined here are set forth in Gopshes' Complaint (ECF No. 1). To the extent the Court discusses facts that Gopshes does not allege in his Complaint, they are uncontroverted and the Court views them in the light most favorable to Gopshes. The Court will address additional facts when discussing applicable law.

[3] Although Gopshes does not present a sworn affidavit with his Opposition, he states that it is his "testimony under oath." (Pl.'s Opp'n at 2, ECF No. 13). Accordingly, the Court considers the statements in Gopshes' Opposition when ruling on Defendants' Motion.

[4] Citations to the Complaint and Gopshes' Opposition refer to the pagination the Court's Case Management and Electronic Case Files ("CM/ECF") system assigned.

Complaint makes various assertions about his medical treatment while incarcerated at ECI, though these assertions are sometimes stated without context and are not in a clear temporal order. The Court, to the best of its understanding, recounts the Complaint's allegations in chronological order, as follows.

In February 2016, Dr. Oteyza "cancelled" Gopshes' pain medication, but he began receiving the medication again Gopshes the following month. (Id. at 2–3). In February 2017, Gopshes' unnamed chronic care provider requested an increased dosage of his pain medication, but Dr. Clem denied the request. (Id. at 2).

On July 26, 2017, Gopshes had an appointment with Dr. Oteyza at which Gopshes informed the doctor that he was in "horrific pain, pain meds only helped for [two] hours after each[ ] time taken, pain jumped right back to [nine] or [ten] [on a ten-point scale of severity]" and that he needed "to get MRI because [his] tail bone was aching and was pressing against nerves in [his] spine." (Id. at 5). Dr. Oteyza submitted a request for Gopshes to see an orthopedic specialist. (Id. at 2). Dr. Oteyza also requested that Gopshes' pain medications be renewed for the next ninety days; however, Dr. Clem "denied [Gopshes'] meds and only approved [Gopshes'] [M]obic."[5] (Id. ). Dr. Clem's decision had the effect terminating Gopshes' 800 mg dose of Neurontin[6] "cold turkey." (Id. at 3).

_____

[5] Mobic is the brand name for the drug Meloxicam, which is a nonsteroidal anti-inflammatory drug ("NSAID") that "is used to relieve pain, tenderness, swelling, and stiffness" caused by arthritis. U.S. Nat'l Library of Medicine, Meloxicam, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601242.html (last visited Mar. 7, 2019).

[6] Neurontin is a brand name for the drug Gabapentin, which is used to control seizures in epileptics and can also be used to relieve the pain of postherpetic neuralgia ("the burning, stabbing pain or aches that may last for months or years after an attack of

Gopshes ran out of his prescription for Neurontin on July 28, 2017 and reports that he did not get "his pain meds back" (presumably referring to Neurontin) until August 25 or 27, 2017,[7] but at a reduced dosage. (Id. ). Gopshes was given 600 mg of Neurontin between August 25 and September 2, 2017 but does not make it clear what happened after this date (i.e., whether his dosage increased, decreased, or was terminated). (See id.).

Gopshes reports that, as of November 5, 2017, he still has not been seen by an orthopedic specialist, is only receiving seven mg of Mobic per day, and remains in a "horrific amount of pain." (Id.). He is "always lying in [his] bunk because of the horrific pain," he eats "one meal a day out of like at least [five] days a week," and he never goes to recreation because his condition prevents him from leaving his cell. (Id. at 4). He states that sick call providers refuse to treat his complaints, informing him that he first needs to see his chronic care provider. (Id. at 3).

Additionally, Gopshes alleges that he went to physical therapy, but he stopped going because he was unable to walk for three days after a therapy session. (Id. at 2). This assertion lacks any contextual details, however, including when the therapy was ordered or provided, who ordered Gopshes to receive physical therapy, and who provided the treatment. Thus, the Court is unable to fit this allegation into the chronology above.

---

shingles") or diabetic neuropathy ("numbness or tingling due to nerve damage in people who have diabetes"). U.S. Nat'l Library of Medicine, Gabapentin MedlinePlus, https://medlineplus.gov/druginfo/meds/a694007.html (last visited Mar. 7, 2019).
[7] Gopshes states "I did not get my pain meds back until August 27th of 2017," but shortly thereafter states "I received 600 mg of [Neurontin] on 8/25/17." (Compl. at 3).

In his Opposition, Gopshes states that he remains in pain, "Mobic is not working [any] more" to alleviate his pain, he is being given only half as many pain relief patches as he desires, and he still has not received an MRI of his hip. (Pl.'s Opp'n at 1–2).

## 2. Gopshes' Medical Records

Accompanying their Motion, Defendants submitted Gopshes' certified medical records, which the Court now summarizes. On January 14, 2016, Gopshes had a chronic care provider visit with Dr. Oteyza regarding pain management. (Defs.' Mot. Dismiss Summ. J. ["Defs.' Mot."] Ex. 1 ["Medical Records"] at 5–6, ECF No. 11-4). Dr. Oteyza noted that Gopshes had been "[o]n neurontin since 10/20/15, baclofen 10 mgm, mobic 15 mgm. Latest is mobic and neurontin." (Id. at 5). Dr. Oteyza switched Gopshes from his combination of Mobic and Neurontin to a combination of Mobic and Baclofen.[8] (Id. at 6) (noting that Gopshes "will use mobic and baclofen"). Dr. Oteyza also ordered that Gopshes receive an x-ray of his lumbar spine. (Id.). The x-ray was performed on February 18, 2016. (Id. at 7). It revealed an "age indeterminate compression fracture of L1 vertebral body" and noted "mild to moderate [degenerative joint disease] present at multiple levels in lumbar spine." (Id.).

In March 2016, Gopshes submitted several sick calls complaining that he was in pain and requesting that he be prescribed Neurontin. (Id. at 8–13). Gopshes' medical

---

[8] Baclofen is a prescription medication that "acts on the spinal cord nerves and decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases. It also relieves pain and improves muscle movement." U.S. Nat'l Library of Medicine, Baclofen, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682530.html (last visited Mar. 7, 2019).

records indicate that a registered nurse reviewed his sick calls; there is no suggestion that either Defendant had contemporaneous knowledge of the sick calls.

On April 13, 2016, Gopshes had an appointment with a physician's assistant who submitted a prescription for Neurontin at a dosage of 400 mg twice a day for treatment of his pain. (Id. at 14–15). Dr. Clem approved the prescription. (Id. at 16).

On April 22, 2016, Gopshes had a chronic care appointment with a nurse practitioner who noted that Gopshes rated his back pain as a seven out of ten in severity and reported that the restarted Neurontin "helps for a few [hours] then tapers off." (Id. at 17). The nurse practitioner discussed with Gopshes that the goal of pain management is "not to el[i]minate pain completely but to make it tolerable enough to allow [activities of daily living]." (Id.). She requested that Gopshes receive an increased dosage of Neurontin (600 mg twice a day), which Dr. Clem approved. (Id. at 19–20).

At Gopshes' next chronic care appointment on July 21, 2016, he stated that "neurontin at present dose brings pain down to 4/10 but only lasts about [four hours]." (Id. at 21). As a result, the nurse practitioner requested that Gopshes' dosage of Neurontin be increased to 800 mg twice a day, which Dr. Clem approved. (Id. at 21, 24). She also discontinued Baclofen based on Gopshes' complaints of muscle spasms and recommended that Flexeril be provided instead; Dr. Clem approved the Flexeril prescription.[9] (Id.). In addition, she submitted a consultation request for Gopshes to receive physical therapy to

---

[9] Flexeril is a brand name for the drug Cyclobenzaprine, which is used "to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." U.S. Nat'l Library of Medicine, Cyclobenzaprine, MedlinePlus, https://medline plus.gov/druginfo/meds/a682514.html (last visited Mar. 7, 2019).

address his complaints of pain in his lower back and right thigh." (Id. at 25). Dr. Clem approved the request. (Id. at 26).

Gopshes received two months of physical therapy, which began on August 9, 2016. (Id. at 27–35).[10] The physical therapist noted that Gopshes "progressed well with treatment." (Id. at 35). At his chronic care appointment on October 7, 2016, Gopshes reported that he was "feeling better with the current physical therapy" and was able to exercise three to four days per week. (Id. at 36).

At his next chronic care appointment on December 21, 2016, Gopshes reported that he performed calisthenic exercises three to four days per week. (Id. at 39). Because Gopshes reported that the Neurontin "brings pain down to 6/10 but only lasts about [four hours]," the treating nurse practitioner requested that his dosage be increased from 800 mg twice a day to 900 mg twice a day. (Id.). Dr. Clem denied the request, but he did approve a prescription for Neurontin at 800 mg two times a day. (Id. at 42, 44).

At his chronic care appointment on April 18, 2017, Gopshes reiterated that the Neurontin "brings pain down to 6/10 but only lasts about [four hours]." (Id. at 46). Dr. Clem approved the nurse practitioner's requests for Neurontin at the existing twice-daily 800 mg dosage, Flexeril, and a new course of physical therapy. (Id. at 49–51). Gopshes attended physical therapy on May 11 and June 13, 2017, but thereafter missed his

---

[10] The physical therapist discharged Gopshes in October 2016. (Medical Records at 35). It appears that the discharge occurred because Gopshes had completed the full course of treatment rather than being discharged for a noncompliance or because the treatment was ineffective. (See id. (discharging Gopshes); id. at 39 (noting that Gopshes "completed" physical therapy)).

appointments. (Id. at 52, 54–56, 59, 71, 73, 75). Conflicting records state that Gopshes was discharged from physical therapy on August 1, 2017 and on November 17, 2017 due to nonattendance. (Id. at 59, 76).

According to Dr. Clem, Gopshes' mental health providers prescribed him Amitriptyline at some point in July 2017, (Clem Aff. ¶ 5, ECF No. 11-5), and this medication is listed in Gopshes' medication list as of August 8, 2017, (Medical Records at 60). Dr. Clem avers that Amitriptyline "has a secondary benefit of neuropathic pain relief." (Clem Aff. ¶ 5).

On July 26, 2017, Gopshes had a chronic care appointment with Dr. Oteyza at which Gopshes stated that his medication provided him with relief from back pain for two hours before the pain returned. (Id. at 57). Dr. Oteyza's notes state that Gopshes "[s]till complains that he has lots of back ache. Will refer to orthopedist for evaluation. Doing stretching. . . . He looks good, physically, not malnourished, moves good with good mind [sic] and quite mobile." (Id.). Dr. Oteyza requested that Gopshes continue with Neurontin at the same dosage, but by Dr. Clem denied this request because it did not indicate a diagnosis justifying the medication. (Id. at 58, 60). Gopshes remained on Mobic, but his Flexeril prescription was not renewed beyond its pre-existing scheduled stop date of August 18, 2017. (Id. at 58, 60, 63; see also Clem Aff. ¶ 5).

Gopshes submitted a sick call slip on August 7, 2017, stating that he had been without "pain meds going on [nine] days" and was in "horrific pain." (Medical Records at 61). On August 8, 2017, Dr. Oteyza resubmitted the request for Neurontin, this time with a diagnostic explanation. (Id. at 60). On August 24, 2017, Dr. Clem approved the

prescription for Neurontin at a dosage of 600 mg twice a day for 30 days, noting that Gopshes should be tapered off the medication. (Id. at 63–64).

On September 6, 2017, a request for an orthopedics consultation was submitted. (Id. at 65). On September 21, 2017, Gopshes' taper of Neurontin continued, and his dosage was decreased to 600 mg once a day. (Id. at 66–67). Gopshes remained on Mobic and Amitriptyline. (Id.).

Gopshes' Neurontin prescription was discontinued on or around October 13, 2017. (See id. at 66) (reporting planned medication stop date of October 13, 2017). On October 14, 2017, Gopshes submitted a sick call request concerning his back pain, stating that, since he had stopped taking Neurontin, he had been unable to get out of bed and was suffering shooting pains. (Id. at 70). He submitted another sick call request on November 7, 2017 complaining of "horrific back pain." (Id. at 72). Although both sick calls indicate that they were reviewed by a provider, the provider's signature is illegible. (See id. at 70, 72).

On November 22, 2017, Gopshes had a chronic care appointment at which he complained of lower back pain. (Id. at 79). According to the treating physician's assistant's notes, "[Gopshes] admits to working in kitchen [six] days a week and works out" and Gopshes "states when the weather changes it increases his pain[ ] making sleeping difficult." (Id.). The physician's assistant observed that Gopshes had restricted movement, but was "able to ambulate, mov[ing] from sitting to standing and walking [without] difficulty, smooth transition." (Id. at 80). Gopshes was prescribed Salonpas patches[11] for

---

[11] Salonpas (methyl salicylate topical) pain patches are "used for temporary relief of muscle or joint pain caused by strains, sprains, arthritis, bruising, or backaches" and are

pain and his prescriptions for Mobic and Amitriptyline were renewed. (Id. at 80). Dr. Clem

approved the request for Salonpas patches. (Id. at 82).

In addition to Gopshes' medical records, Defendants submitted an affidavit from

Dr. Clem, in which he avers that

> [Gopshes'] complaints of debilitating 10/10 pain are not
> supported by clinical evidence. [Gopshes] does have spinal
> tenderness and moderately impeded trunk range of motion,
> however he is able to ambulate with smooth transitions and is
> able to get up and down from sitting without difficulty.
> [Gopshes] admits to working in the kitchen six days a week
> and working out 3-4 days a week. In May 2018, [Gopshes] was
> evaluated by a physician as being well controlled overall on
> Mobic and Salonpas. From this it would appear that [Gopshes]
> has simply fixated on Neurontin as his drug of choice.

(Clem. Aff. ¶ 6). Dr. Clem goes on to report that Neurontin was identified by the State

Medical Director of the Department of Public Safety and Correctional Services ("DPSCS")

as a drug with "patterns of overuse and abuse" in the prison population such as "hoarding

of this medication by inmates for improper use due to its narcotic and sedative like [effect]

or for trade to other inmates for misuse in exchange for secondary benefits." (Id. ¶ 13). Dr.

Clem avers that, based on these risks, DPSCS has tried to eliminate use of Neurontin except

for the treatment of those conditions for which it has been FDA-approved. (Id. ¶ 14).

Neurontin has only been approved for use as an anticonvulsant for seizure conditions and

for neuropathic pain caused by herpes or shingles, conditions from which Gopshes does

not suffer. (Id.).

---

placed directly on the affected area. Salonpas Pain Patch, Drugs.com,
https://www.drugs.com/mtm/salonpas-pain-patch.html (last visited Mar. 7, 2019).

## B. Procedural Background

On November 8, 2017, Gopshes sued Dr. Clem and Dr. Oteyza. (ECF No. 1). Although Gopshes does not expressly state the claims he brings against Defendants, based on the nature of his allegations, the Court construes his Complaint as alleging deliberate indifference to his medical needs in violation of the Eighth Amendment. (See generally Compl.). Gopshes seeks injunctive relief and monetary damages. (Id. at 6).

On July 30, 2018, Defendants filed their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 11). Gopshes filed an Opposition on August 8, 2018. (ECF No. 13).[12] To date, the Court has no record that Defendants filed a Reply.

## II. DISCUSSION

## A. Conversion of Defendants' Motion

Defendants' Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court

---

[12] The Court notes that Gopshes' Opposition does not address Defendants' arguments. Instead, it repeats many of the allegations in the Complaint and addresses the ineffectiveness of his current medication regimen. Gopshes also requests that the Court appoint him counsel. (Pl's Opp'n at 2). Because the Court will grant Defendants' Motion, the Court will deny Gopshes' request.

"has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir.

1996)). To raise the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration, explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56.

Here, the Court concludes that both requirements for conversion are satisfied. Gopshes was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants styled their Motion in the alternative for summary judgment and presented extensive extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, Gopshes filed an Opposition but did not include a request for more time to conduct further discovery. Because the Court will consider documents outside of Gopshes' Complaint in resolving Defendants' Motion, the Court will treat the Motion as one for summary judgment.

## B.  Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in

evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4).

Following a properly supported motion for summary judgment, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

C.  **Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976); <u>see</u> <u>also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 737 (2002); <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016); <u>King v. Rubenstein</u>, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." <u>De'Lonta v. Angelone</u>, 330 F.3d 630, 633 (4th Cir. 2003); <u>accord</u> <u>Anderson v. Kingsley</u>, 877 F.3d 539, 543 (4th Cir. 2017).

In order to state an Eighth Amendment claim for denial of medical care, Gopshes must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." <u>Grayson v. Peed</u>, 195 F.3d 692, 695–96 (4th Cir. 1999). Deliberate indifference "requires more than ordinary lack of due care for the prisoner's interests or safety." <u>Id.</u> at 696 (internal quotation marks omitted) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319, (1986)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "one that has been diagnosed by

a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component is satisfied only where a prison official subjectively "knows of and disregards an excessive risk to inmate health or safety." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (quoting Farmer, 511 U.S. at 837); see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 106 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 105-06; see also Jackson, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference.").

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of

the risk the defendant actually knew at the time. See Brown v. Harris, 240 F.3d 383, 390 (4th Cir. 2001).

The right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977). Moreover, a prisoner's disagreement with a prescribed course of treatment does not establish deliberate indifference. See Peterson v. Davis, 551 F.Supp. 137, 146 (D.Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984). Likewise, claims of medical negligence or disputed questions of medical judgment are not cognizable because they do not involve deliberate indifference. See Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (stating questions of medical judgment are not subject to judicial review). Indeed, the "mere failure to treat all medical problems to a prisoner's satisfaction . . . is insufficient to support a claim under § 1983." Peterson, 551 F.Supp. at 146; accord Fore v. Goodwin, 407 F.Supp. 1145, 1146–47 (E.D.Va. 1976) (citing Cole v. Williams, 526 F.2d 588 (4th Cir. 1975)) ("A prisoner cannot be ultimate judge of what medical treatment is necessary or proper . . . .").

Gopshes' alleges that Dr. Oteyza and Dr. Clem exhibited deliberate indifference to his pain in violation of the Eighth Amendment. The Court addresses Gopshes' claims against each Defendant in turn.

### 1.    Dr. Oteyza

Gopshes' Complaint discusses two appointments with Dr. Oteyza. First, Gopshes alleges that Dr. Oteyza "cancelled" Gopshes' pain medication during a February 2016

appointment. (Compl. at 2). But Gopshes' certified medical records demonstrate that at Gopshes' January 14, 2016 appointment,[13] Dr. Oteyza did not wholly terminate Gopshes' medication. (Medical Records at 5–6). Instead, Dr. Oteyza purposefully switched Gopshes from a regimen of Mobic and Neurontin to Mobic and Baclofen. (Id.). This merely reflects a dispute over the specific course of treatment, not deliberate indifference to Gopshes' medical needs. See Estelle, 429 U.S. at 105–06. Moreover, the record reveals that, after Gopshes complained that his new medication regimen was less effective at controlling his pain, Gopshes was again prescribed Neurontin. (Medical Records at 14-15).

The second mention of Dr. Oteyza in the Complaint is Gopshes' July 26, 2017 chronic care appointment. (Compl. at 5). Gopshes appears to take issue with the fact that his Neurontin prescription was not immediately refilled following this appointment. (See id.). Gopshes' medical records reflect that Dr. Oteyza requested that the Neurontin prescription be refilled, (Medical Records at 57, 60), but because Dr. Oteyza did not provide a diagnostic explanation for renewing the prescription, Dr. Clem denied the request, (id. at 60). Gopshes does not allege nor is there anything in the record to suggest that Dr. Oteyza's lack of explanation was purposeful or anything but an inadvertent oversight. Indeed, after the request was denied, Dr. Oteyza resubmitted a request with an explanation and Dr. Clem partially approved the request. (Id. at 60, 64). As to Gopshes' report that he informed Dr. Oteyza at this appointment that he needed an MRI, Gopshes

---

[13] The records do not indicate that Gopshes had an appointment with Dr. Oteyza in February 2016, so the Court assumes that Gopshes is referring to the January 14, 2016 appointment.

acknowledges that Dr. Oteyza submitted a request for a consultation with an orthopedic specialist. (Compl. at 3; Medical Records at 57, 65). To the extent Gopshes is claiming that Dr. Oteyza was deliberately indifferent because he failed to procure an MRI, it is unclear what additional actions Gopshes believes Dr. Oteyza should have taken to provide one.

Thus, the Court concludes that Gopshes fails to establish a genuine dispute of material fact that Dr. Oteyza's actions or inactions related to the February 2016 or July 26, 2017 appointment amounted to deliberate indifference. Accordingly, the Court will grant Defendants' Motion as to Gopshes' claims against Dr. Oteyza.

### 2. Dr. Clem

As to Gopshes' allegations against Dr. Clem, Gopshes first faults Dr. Clem for denying the requested increase of his Neurontin dosage from 800 mg twice a day to 900 mg twice a day in February 2017.[14] (Compl. at 2; Medical Records at 42). But Gopshes provides no evidence or information to suggest that this decision was anything other than Dr. Clem's exercise of medical judgment. Supporting the idea that Dr. Clem was exercising medical judgment is his affidavit stating that medical literature indicates that "[l]arge doses [of Neurontin] did not increase benefit but did markedly increase harmful effects," and that 1800 mg daily is the theoretical maximum dose, while the effective maximum dose is 900 per day. (Clem Aff. ¶ 8). Thus, the Court concludes that Gopshes fails to establish that Dr.

_____

[14] It appears likely that Gopshes is actually referring to Dr. Clem's decision to deny the increase in December 2016, (see Medical Records at 42), as there is nothing in the record indicating that Gopshes had any medical encounters in February 2017.

Clem was deliberately indifferent to his medical needs merely because he refused to slightly increase his dosage of Neurontin.

Next, Gopshes claims that Dr. Clem denied his prescription for Neurontin and forced him to stop the medication "cold turkey" in late July 2017 and, even after approving the medication, provided him with a tapered dose. (Compl. at 3). Gopshes' medical records indicate, however, that Dr. Clem denied the prescription because the request failed to provide an explanation for why the medication was necessary. (Medical Records at 60). Gopshes does not allege, nor is there any indication, that the delay in his prescription being renewed was the consequence of anything other than Dr. Clem's exercise of medical judgment—i.e., refusing to authorize a medication where no explanation was given, particularly in view of the potential problems with this medication in the prison population mentioned in Dr. Clem's affidavit. (Clem Aff. ¶ 12).

As to Dr. Clem's decision to taper Gopshes off Neurontin, this was plainly an exercise of medical judgment, as Clem's affidavit and the medical records underscore. (See Medical Records at 66 (stating that taper was "due to medical indications for the [N]eurontin"); Clem Aff. ¶ 14 (averring that Gopshes did not have a condition for which the FDA has approved the use of Neurontin and explaining concerns about Neurontin in prison population)). Moreover, as Dr. Clem's affidavit notes, Gopshes' behaviors and objective appearance belie the notion that Gopshes is suffering from horrific pain and requires this specific medication for treatment. (See Clem Aff. ¶ 6 ("[Gopshes] is able to ambulate with smooth transitions and is able to get up and down from sitting without

difficulty. [Gopshes] admits to working in the kitchen six days a week and working out [three to four] days a week."); see also Medical Records at 57, 78–79, 88–89, 95).

Thus, the Court concludes that Gopshes fails to establish a genuine dispute of material fact that Dr. Clem's actions or inactions related to the denial of and changes to Gopshes' Neurontin prescription amounted to deliberate indifference. Accordingly, the Court will grant Defendants' Motion as to Gopshes' claims against Dr. Clem.

### 3. Other Claims

Some of Gopshes' claims are not specifically directed at either named Defendant but appear more broadly directed at his overall medical treatment. The Court addresses these claims below.

#### a. MRI

Gopshes asserts that he has been denied an MRI of his lower back or pelvis, despite doctors at UMMC Shock Trauma telling him that he would need an MRI. (Compl. at 2, 5; Pl.'s Opp'n at 1). But there is nothing in Gopshes' medical records indicating that he directly informed providers of this assertion; this is true even as to Gopshes' numerous sick calls. (See Medical Records at 8–9, 11, 53, 61, 68, 70, 72, 83, 99). The closest Gopshes comes in the medical records to stating that UMMC doctors informed him that he needed an MRI is his statement, recorded by Dr. Oteyza, that he "[w]as told by shock trauma doctors that part of tail bone may need to be cut off in 2014. Was not checked by orth[o]pedist as he was incarcerated in 2014." (Id. at 57).

Assuming that Gopshes communicated to prison medical providers that UMMC doctors said he should get an MRI, the Constitution does not obligate prison medical

providers to forego their own medical judgment and obey a third-party instruction, particularly given that they were treating Gopshes more than two years after UMMC allegedly doctors made that recommendation. Cf. Russell, 528 F.2d at 319. Moreover, prison medical providers do not have to accept as true an inmate's assertion about a past medical provider's instruction without verification or investigation. Although Gopshes pleads that he has "medical proof, from [his] medical records from Shock Trauma," (Compl. at 2), he does not state that he provided or offered this proof to prison medical providers. Thus, Gopshes fails to demonstrate that his lack of an MRI amounts to a constitutional violation.

### b.      Orthopedic Consult

Gopshes alleges that he "was suppose[d] to be seen by an [Ortho]pedic doctor and [it's] 11-5-2017 still nothing." (Compl. at 3). It is unclear if this rises to the level of deliberate indifference, but there is a threshold issue in that Gopshes does not attribute this failing to any particular individual. The medical records reflect that Doctors Oteyza and Matera submitted a request for an orthopedics consult on September 6, 2017, (Medical Records at 65); however, it is unclear what happened to the request after that point. The fact that Dr. Oteyza was one of the doctors who requested the consult indicates that he lacks the authority to approve or deny such requests, and Gopshes does not contend there was any other action Dr. Oteyza should have taken. Moreover, Gopshes does not allege that Dr. Clem had any involvement in the consult decision and he does not name anyone other than Dr. Oteyza or Dr. Clem as a Defendant. Given Gopshes' failure to attribute this

alleged harm to any person, the Court will dismiss this claim without prejudice to Gopshes' ability to refile this claim, supported by adequate factual allegations, in the future.

In sum, because Gopshes fails to establish a genuine dispute of material fact regarding Defendants' deliberate indifference to his medical needs, the Court will grant Defendants' Motion.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 11). The Court will dismiss without prejudice Gopshes' claim that he has been denied an orthopedic consult. A separate Order follows.

/s/

March 26, 2019
Date

George L. Russell, III
United States District Judge